UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

FILED

00 JAN 10 AM 11: 24

U.S. ~~ ~~ ~ ~ COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| SHARON RIVERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. CV98-S-1126-NE |
| | ) | |
| OAKWOOD COLLEGE, INC., | ) | **ENTERED** |
| | ) | |
| Defendant. | ) | JAN 1 0 2000 |

**MEMORANDUM OPINION**

Plaintiff, Sharon Rivers, is the former laboratory coordinator
for the chemistry department at defendant, Oakwood College, Inc.
Her complaint contains six claims, all of which are premised on
alleged violations of Title VII of the Civil Rights Act of 1964, as
amended, 42 U.S.C. § 2000e et seq.: i.e., disparate impact on the
basis of plaintiff's sex and religious preference; disparate
treatment on the basis of her sex and religious preference; and
both sex-based and religious-based hostile work environment
claims.[1]

The action now is before the court on defendant's motion for
summary judgment (doc. no. 18), together with its motion to strike

---

[1] Plaintiff has not included a claim of national origin discrimination in
her complaint, although she asserts such allegations in her deposition and in her
charge of discrimination filed with the Equal Employment Opportunity Commission
("EEOC"). Such failure is fatal to her national origin claim and, accordingly,
the court restricts its analysis to those claims actually pleaded. See Maniccia
v. Brown, 171 F.3d 1364, 1367 n.1 (11th Cir. 1999) (agreeing with the district
court's finding that plaintiff's complaint did not contain a sexual harassment
claim, and noting that "[w]hether [plaintiff] alleged sexual harassment in prior
proceedings does not affect the contents of her complaint").

(doc. no. 31). After careful consideration of the briefs of counsel, the relevant law, and the record as a whole, the court finds that both motions are due to be granted.

## I. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. ..." (Emphasis added.) The movant bears the initial burden of showing the court, by reference to materials on file, that no genuine issues of material fact exist to be decided at trial. *See Celotex Corp. v. Catrett* , 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). The moving party discharges this burden by "showing" or "pointing out" to the court that there is an absence of evidence to support the non-moving party's case. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995)(*per curiam*). Rule 56 permits the movant to discharge this burden with or without supporting affidavits. *See Celotex*, 477 U.S. at 324, 106 S.Ct. at

2

2553. When the moving party has discharged its burden, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. *See Jeffery,* 64 F.3d at 593.

In deciding whether the moving party has met its burden, the court is obligated to draw all inferences from the evidence presented in the light most favorable to the non-movant and, also, to resolve all reasonable doubts in that party's favor. *See Spence v. Zimmerman,* 873 F.2d 256 (11th Cir. 1989). Inferences in favor of the non-movant are not unqualified, however. "Mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment." *Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 592 (11th Cir. 1995) (citation omitted). Moreover, evidence that is merely colorable, *see Brown v. City of Clewiston,* 848 F.2d 1534, 1537 (11th Cir. 1988), conclusory, *see Peppers v. Coates,* 887 F.2d 1493, 1498 (11th Cir. 1989), or conjectural, does not create a genuine issue of material fact.

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment. *See Augusta Iron & Steel Works v.*

3

*Employers Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988). A "genuine" dispute about a material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Jeffery*, 64 F.3d at 594 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). The bottom line is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52, 106 S.Ct. at 2512.

## II. FACTUAL BACKGROUND

Sharon Rivers was employed by Oakwood College, Inc., a private, not for profit college founded in 1896 by the Seventh-Day Adventist Church, as laboratory coordinator for the college's chemistry department. (Complaint ¶¶ 1,6; Price's affidavit at n.1.) She worked in that capacity for almost two years, from January 13, 1992, when Dr. Ephraim Gwebu, chairman of the chemistry department and plaintiff's immediate supervisor, recommended that the college hire her, until November 15, 1993, the effective date of her forced resignation. (Plaintiff's deposition at 91; Gwebu's affidavit ¶ 2.)

As the chemistry department's laboratory coordinator, plaintiff

4

was responsible for keeping the laboratory clean and accessible to students and faculty, and stocking all laboratory supplies. (Plaintiff's deposition at 55-57; Gwebu's affidavit ¶ 3.) Plaintiff also was responsible for coordinating the activities of lab assistants, and if a lab assistant was absent, plaintiff was required to fulfill their lab responsibilities as well. (Plaintiff's deposition at 63-64; Gwebu's affidavit ¶ 3.) Plaintiff admits that failure to perform any of the above-stated duties would be grounds for immediate discipline, including the extreme sanction, discharge. (Plaintiff's deposition at 55-58, 64, 67-68.)

Initially, plaintiff was paid an hourly wage, amounting to $7.44 an hour, and she worked approximately 36 hours each week. (Gwebu's affidavit ¶ 2.) Her working hours were generally from 8:00 a.m to 5:30 p.m., Monday through Thursday, and from 8:00 a.m. to noon on Friday. (Plaintiff's deposition at 43.) In May of 1992, however, plaintiff became a full-time salaried employee, earning approximately $18,000 a year. (*Id.* at 50.) The parties differ as to the explanation for that change in status. Plaintiff contends that she should have been a salaried employee from the beginning, and that Dr. Gwebu initially offered her $18,000 a year:

When I started, [Dr. Gwebu] offered me 18, and that's what

5

> I assumed that ... it was going to be. ... [A]fter a couple
> of pay periods, I brought that to his attention, and he said
> he would get it straightened out, and it took them awhile to
> get it straightened out.

> And since my husband was Seven-Day Adventist and he knew
> Ted and everybody else, their procedure — because I'm
> Baptist — he went and spoke to a couple of people for me,
> and they straightened it out probably by May, and it was
> 18,000 after that.

(*Id.*) On the other hand, Dr. Gwebu contends that in March of 1992, he "recommended that she be made a full-time salaried employee, with employee benefits, a change which became effective on May 14, 1992." (Gwebu's affidavit ¶ 4) Dr. Gwebu avers that he recommended this change because, "[i]nitially, Ms. Rivers performed well in her job. She did a good job of cleaning the labs and keeping them neat and orderly." (*Id.*)

In any event, plaintiff received two additional raises during her subsequent employment with the college. In June of 1992, plaintiff received a pay increase that resulted in a new annual salary of $18,414. (Plaintiff's deposition at 252.) Her salary was increased again in June of 1993, to $18,986 a year. (*Id.* at 53.)

Although plaintiff held a Bachelor of Science Degree in biology, she desired to work towards a Masters Degree in chemistry education. (*Id.* at 19-20.) In January of 1993, therefore, she

6

approached Dr. Gwebu about the possibility of attending graduate
classes in the afternoon at Alabama A & M University, located at
Normal, near Huntsville, Alabama. (*Id.* at 233-236.) Plaintiff
told Dr. Gwebu that classes were scheduled on Monday and Wednesday
of each week, and "most of them start at 4:00 in the afternoon and
go to 7:00 and from 7:00 to 10:00." (*Id.* at 233.) Dr. Gwebu gave
plaintiff permission to take the graduate classes, provided she
"forfeit [her] lunch in order to make-up for the time that [she]
will be in class." (Defendant's exhibit 1, no. 18.)

Plaintiff contends that her relationship with Dr. Gwebu began
to change around that same time. (Plaintiff's deposition at 209.)
That assertion is bolstered by a series of memoranda beginning in
January of 1993, in which Dr. Gwebu recorded complaints about
various aspects of plaintiff's work performance and habits. In the
first memorandum, dated January 27, 1993, he complained about
plaintiff leaving her office without informing faculty of when she
would return. Accordingly, Dr. Gwebu instituted a time card policy
for plaintiff effective February 1, 1993. His January 27, 1993
memorandum stated:

> Mrs. Sharon Rivers, I am requiring you to use a time card
> with effect from February 1, 1993. It is essential that I
> know where you are during your working hours in order to
> better serve the interests of all students and faculty in

7

the Department....

It is not [satisfactory] to simply inform me where you are going without any indication of when you will be back and the time that you actually get in.   I, personally have students enrolled in the Research and Independent Study. These students do not have regular Lab. hours.   Therefore, I need to know that I can send them to you whenever they need your assistance and your time card indicates that you are in.

(Defendant's exhibit 1, no. 17.)

Plaintiff, in her deposition, admits that she left her office at times during the work day.  (Plaintiff's deposition at 257-265.) She contends, however, that her supervisors and co-workers knew where she was at all times, and that her duties as a laboratory coordinator required her to leave her office at various times during the day.  Plaintiff testified:

- Q.   First of all, did your position as lab coordinator require you to perform tasks outside of your office?
- A.   Yes.
- Q.   What sort of tasks would those have been?
- A.   You have to move around to each lab with carts taking supplies to each one of them and cleaning them.
- Q.   And so your position as lab coordinator was not restricted solely to your being in your office at all times?
- A.   No.  You had to go out and prep the labs.

(Plaintiff's deposition at 280-281.)  Plaintiff also disputes the assertion that her whereabouts were unknown:

- Q.   You knew they expected you to let them know where

8

```
          you were during lab hours.
     A.   Yes.
     Q.   And that was a reasonable expectation on their
          part?
     A.   Yes.
     ...
     Q.   It's a legitimate problem if they need you and
          can't find you during lab hours.
     A.   But they knew where I was. ... What I'm saying is
          the note told them where I was on campus. Let me
          — maybe I need to explain something about their
          labs that you're not — maybe not understanding....
     ...
          The labs, most of the labs, were conducted on
          Thursday and one lab on Wednesday. And if I left
          out of that stockroom, I left a note on the door to
          let them know where I was. And I didn't just
          disappear and they didn't know where I was. And
          something else I need to bring to your attention,
          every time I went to their office to tell them
          sometimes where I'm going across campus or walk
          over to this place, they weren't in their office.
          So that's how the note situation came about.
```

(*Id.* at 241-243.)

Dr. Gwebu's next memorandum was dated May 5, 1993 and related to plaintiff's request for permission to enroll in graduate classes at Alabama A&M University. (*Id.*, no. 17.) Dr. Gwebu complained that her graduate classes resulted in an absence from work:

At the beginning of the year, you requested permission to take courses from Alabama A & M University. You informed me that classes started late afternoon on Mondays and Wednesdays. You made me to understand that you will forfeit your lunch in order to make-up for the time that you will be in class.

Your request was granted on condition that your

9

responsibilities and obligation to the College would continue unabated. This morning, you left a message at 8:02 stating that you will not be at work all day because of exams at Alabama A & M University. You did not indicate to me who was designated to assist the organic chemistry students in their independent research projects and the lab assistants preparing experiments for tomorrow['s] laboratories, etc.

Mrs. Rivers, I am interested in a work environment that minimizes tension, misunderstanding, ill feeling, and outright unhappiness. One way of avoiding this, is a constant dialogue and communication, as we work together for the college. What I expected you to have done was to let me know on Tuesday or earlier about your exams at Alabama A & M. Then there would have been no need for this memo. Leaving messages with Mrs. Hamilton is not enough, unless it is an emergency.

(*Id.*)

Plaintiff also alleges that Dr. Gwebu began to discriminate against her on the basis of her religious preference and her gender. Although plaintiff was Baptist, her husband was a Seven Day Adventist, and she attended his church during their marriage. (Plaintiff's deposition at 178, 184.) Even so, plaintiff contends that the college was aware that she held a different religious persuasion. On one occasion, for example, during the spring of 1993, plaintiff was attending a chemistry department faculty meeting and statements were made about her beliefs:

In one meeting, they was ordering something to eat, and everybody there ordered vegetarian chicken, I believe. And when it came time for me to order, I guess it was in a joke form, [Dr. Gwebu] was like, wait a minute, Sharron might not

10

like vegetarian meat because she's Baptist, so let's wait
and see what she wants to order, in a joking statement.

(*Id.* at 114-115.)

In another faculty meeting, the possibility of holding
laboratory classes on Sunday was discussed. (*Id.* at 116.)
Plaintiff, however, together with Mr. Patel, another non-Seventh
Day Adventist member of the faculty, voiced their displeasure with
such a suggestion, and "they accommodated me and Mr. Patel by not
having the labs on Sundays." (*Id.* at 116.)

In yet another meeting, plaintiff claims that Dr. Gwebu made
derogatory remarks about her gender. Specifically, Dr. Gwebu, a
native of Africa, "made reference to the way females are treated
and respected in Africa [and how that] is a big difference to what
or the way things are done in America." (*Id.* at 79.) Plaintiff
was offended by that comment, because African women "are treated as
second-class citizens or third as opposed to a male, ... they must
walk behind a male, ... they must do what they are told to do[,]
and they don't have as many rights or can't voice their opinion as
females in America." (*Id.* at 102.)

On another occasion, Dr. Gwebu came into the laboratory and
"made some small comment about [how] females sometimes ... are
incompetent." (*Id.* at 103.) Plaintiff testified that the comment

11

was made in connection with a broken centrifuge machine in the laboratory, and that Dr. Gwebu remarked "a male probably could have taken the machine apart, looked inside the working mechanisms, put it back together and possibly it would have worked as opposed to a female.... [W]hat I gathered from it is...being female, [there is] no way that you can have the intelligence to take this machine apart and put it back." (*Id.* at 105-106.)

In the summer of 1993, Dr. Gwebu went on sabbatical to Mehary Medical College in Nashville, Tennessee. (Gwebu's affidavit ¶ 6.) During his absence, Dr. Kenneth Lai Hing served as the acting chairman of the chemistry department. (*Id.*) Significantly, Dr. Lai Hing also registered complaints about various aspects of plaintiff's job performance. (*Id.*; *see also* Lai Hing's affidavit ¶ 2.) Specifically, Dr. Lai Hing complained that plaintiff frequently arrived late to work, she "often was not present in her office and was not accessible during the work day," and that she failed to perform the most important task for a laboratory coordinator during the summer session, namely, ordering chemistry supplies for the upcoming fall labs.[2] (Gwebu's affidavit ¶ 6; Lai

---

[2] Plaintiff admitted that stocking the lab is an important task, but denied that she failed to keep it properly stocked. She testified:

> Q.    Do you remember Dr. Gwebu complaining in August of 1993 that the lab wasn't properly stocked?

12

Hing's affidavit ¶ 2.)

Dr. Gwebu returned from his sabbatical in August and, immediately thereafter, wrote several additional memorandums critical of plaintiff's performance. In a memorandum dated August 10, 1993, Dr. Gwebu complained that plaintiff was not in her office or anywhere in the chemistry department. Dr. Gwebu's August 10, 1993 memorandum stated, in its entirety:

I was looking for you this afternoon after 2:00 p.m.   I

---

A.   No.
Q.   You don't remember that?
A.   No.
Q.   If the lab isn't properly stocked, that's a legitimate concern
     isn't it?
A.   Yes.
Q.   Did you know what supplies you were supposed to order for the
     upcoming quarter's labs?
A.   Yes.
Q.   So it was your responsibility to make sure they were properly
     stocked?
A.   Yes, if I'm given the money.  Well, could I explain that
     process to you to make it clear?
Q.   Sure.
A.   Okay.   I type out a requisition — go through the drawers
     during the summer months and look and see what they're low on,
     whether it's beakers, test tubes, graduated cylinders, the
     whole shebang.  You type out a requisition.  Once you type the
     requisition, turn it in to them, they are responsible for
     getting it to the people and everybody that needs to sign it
     for those items to be paid for and assigning it a purchase
     order number.

     If it doesn't get assigned a purchase order number, the
     company that you're ordering it from will not ship it out.  So
     I could have ordered it, but if the paperwork — every place
     where it was supposed to go to get the correct signatures, if
     it didn't reach there in time, you don't get your supplies in
     time.

(Plaintiff's deposition at 231-232.)

13

could not find you anywhere in the Department.

In my memo dated May 5, 1993, I stressed the importance of
communication. I am not pleased that this importance is not
being taken seriously by you. Please come to my office to
discuss this.

Thanks.

(Defendant's exhibit 1, no. 6.)

In a memorandum dated August 31, 1993, Dr. Gwebu complained

about plaintiff's inappropriate work attire, and her absences from

work due to her graduate courses. Dr. Gwebu's August 31, 1993

memorandum stated, in pertinent part:

1)    As a lab coordinator you work with chemicals; some of
      which are dangerous and yet, you continue to come to
      work in an attire not appropriate for working in the
      lab.   I have brought this matter to your attention
      several times before.

2)    Taking a course is a privilege that is accorded to
      employees of the College. Last year, I allowed you
      to take courses at Alabama A & M University during
      working hours.   This privilege cannot be continued
      indefinitely.

      Since you have not indicated how your graduate school
      attendance will enhance your responsibility as a lab
      coordinator, I do not see how your request to take
      classes during your work hours can be acceptable.
      Both classes start at 4:00. This means that you have
      to leave at least 15 minutes before that time, and
      this adds up to at least three and a half hours per
      week.

   I have discussed your request with Personnel Officers.
   There are three options available to you:
   1.   be strictly on a time card (punching in and out).

14

        This will allow you to punch out when you go to
        class,
2.    [subtract] some of your class time from your vacation
        time,
3.    be a part time employee at Oakwood College[.]

Please, let me know which option you prefer.

(Defendant's exhibit 1, no. 25.)  Dr. Gwebu's latter complaint was
based, at least in part, on changes in plaintiff's academic
schedule.  Rather than taking classes every Monday and Wednesday as
she did during the spring semester, plaintiff's graduate classes in
the fall semester were every Tuesday and Thursday.  (Plaintiff's
deposition at 233-234.)

Plaintiff responded to Dr. Gwebu's August 31, 1993 memorandum
with a letter of her own, dated September 7, 1993.  (Defendant's
exhibit 1, no. 27.)  In her letter, plaintiff took issue with Dr.
Gwebu's complaints, stating that her dress was more casual in the
summer due to the absence of students, and that she would
compensate for time missed when attending graduate courses by going
to work early.  (*Id.*)  Plaintiff's letter stated, in pertinent
part:

    Your "Issues of Concern" about my schooling left me
    devastated. I guess I was being [naive] to assume that all
    Adventists would strive to help each other to be "the head
    and not the tail." However I did sense my responsibility to
    maintain in my position obligations and minimize time away
    during working hours.  I take issue was your specific
    concerns as follows:

15

1.    You emphasized my improper attire by stating that [I] worked with "dangerous chemicals." If I did not cover my attire with a lab coat and/or a rubber apron (Which I do) any attire I wear would be "in appropriate." I must admit, however, my attire during the summer, due to the hot weather and the absence of students, was different from what it will be now.

2.    Taking courses is a privilege and it is also a benefit. You stated that, "I allowed you to take courses at Alabama A & M" but I guess I was mistaken to think that it was the college that allowed me to take courses and your role was to assist me and the college to benefit. You stated that the "privilege cannot be continued indefinitely," when infact [sic], the benefit can go on as long as the college benefits, my work is not jeopardized, and I am a full time employee.

3.    You misrepresented the facts about the worktime and my program's benefits [to] the school. You stated "that the time away during worktime is at least 3 and a half hours per week." I told you that on the days I go to class I do not take a lunch hour, consequently, according to your calculations I am only missing ½ hour per week. I will be coming to work before 8:00 a.m. Monday through Thursday to make up the time missed. I have been clocking in and out.

(*Id.*)

Around this time, plaintiff's office was damaged due to a fire in the building. (Plaintiff's deposition at 80.) According to plaintiff, Dr. Gwebu should have supervised the repair of her office, but he did not. (*Id.*) "I had to go to the people at the physical plant that knew me because from time to time they would

16

come over and repair things in the lab. Out of the goodness of their heart, they repainted my office, and changed the locks...." (*Id.* (emphasis supplied)). According to plaintiff, the only lock changed was the one on the door of her office; neither the stockroom nor laboratory locks were changed. (*Id.* at 221-222.) Plaintiff did not obtain Dr. Gwebu's approval for the lock change, however, nor did she advise him that such change had occurred. (*Id.* at 230.) Indeed, plaintiff admits that she discussed the issue with Dr. Gwebu and he specifically instructed her not to change the locks. (*Id.* at 282.) Moreover, numerous faculty members, including Dr. Gwebu and Dr. Lai Hing, had keys to her office door prior to her having the locks changed. (*Id.* at 222.)

On the afternoon of September 7, 1993, Dr. Gwebu wrote plaintiff another memorandum and, on this occasion, the controversy centered around plaintiff changing the locks on her office door. (Defendant's exhibit 1, no. 26.) The memorandum stated:

This afternoon at 2:45 p.m., Dr. Lai Hing came to my office to inform me of two things:
1) the Lab had to be [canceled] because of the master key for the lockers
2) he wanted me to open your office to find the master key.

Neither my keys nor Mrs. Hamilton['s][3] keys could open the

---

[3] Mrs. Hamilton is the chemistry department's secretary. (Dr. Price's affidavit ¶ 3.)

17

door. Subsequently, I asked you about the key to your office. Initially, you told me that Mrs. Hamilton had the key; yet you know that she did not have the key. You informed me that you had authorized Mr. Cartright to make a special key for your office. I told you to inform me in writing what was the justification for authorizing [a] key change without my knowledge and approval, on or before 9:00 a.m. Wednesday, September 8, 1993.

As you know[,] all faculty must have access to all offices, laboratories and rooms.

(*Id.*)

Plaintiff contends that it was not necessary for Dr. Gwebu, or any other faculty member, to have a key to her office door. (Plaintiff's deposition at 226.) Although plaintiff admits that she had the master key, she argues that Dr. Gwebu knew that the key was not in her office. (*Id.* at 219.)

He's making it look like ... the master key is left in my office and I had the office locked so they couldn't do the lab. Now ... they knew I had the master key. And when I left, the key was on the key ring with all the other keys. It went with me. So this was an arbitrary day that he needed to get in a drawer, I guess to get something out, and I just happened not to be there.

(*Id.* at 219-220.) Additionally, although plaintiff acknowledges that there was only one master key, plaintiff contends that individual keys to both the stockroom and the drawers in the laboratory were hanging on a wall inside the laboratory and not in her office. (*Id.* at 226.)

18

A. There were keys that match every single lab drawer in there. They don't necessarily have to have the master key to get in them. They issue — we issue the keys to the students when we check out the lab drawer.

Q. And where are those keys kept?

A. On the wall inside the stockroom, not inside my office. A wall that they're [sic] in a casing. So probably what this is to, Dr. Lai Hing wanted to get in a drawer, any specific arbitrary drawer in the lab. He probably went to the stockroom, looked on the row where the keys are, couldn't find the key, and then went around and said, well, Ms. Rivers has the master key, she's not here, so lab has to be canceled. I feel like that's poor planning on his part.

(*Id.* at 226-227.)

On September 27, 1993, Dr. Gwebu notified plaintiff by memorandum that he was "putting [her] on probation with effect from September 30, 1993." (Defendant's exhibit 1, no. 30.) As grounds for the probation, Dr. Gwebu stated that plaintiff had been absent from work again, and had failed to make preparations in advance for a lab that was scheduled that day.

Thursday is the day when there are several laboratories going on simultaneously. This morning was no exception. This, notwithstanding, you were not at work today when Miss Benn and her lab assistant needed materials for the lab. In order to explain your absence you left a message on Mrs. Flore Hamilton's answering machine for me and not Miss Benn who needed your services immediately. Because I had a class from 8:00 to 9:40 a.m., the message of your absence did not get to me until after my class. I have told you in the past not to leave messages when you can reach me, even at home. (Case in point, you called me after 10:30 p.m. when you wanted to take your vacation.)

19

        . . .
        Consequently the lab started 40 minutes late.  This reflects
        badly on the Department.

(*Id.*)

        Prior to sending this last memorandum, Dr. Gwebu spoke with Dr.
Sandra Price, vice-president of academic affairs, about his
concerns over plaintiff's work performance.  (Price's affidavit ¶
3.)  In her capacity as vice-president of academic affairs, Dr.
Price was responsible for making recommendations to the college's
president about the hiring and firing of employees.  (*Id.* ¶ 2.)
Dr. Gwebu previously had spoken with Dr. Price in the Spring of
1993 and, subsequent to their conversation, Dr. Price investigated
Dr. Gwebu's complaints about plaintiff.  (*Id.* ¶ 3.)  She spoke
with several students and other faculty members who "verified that
[plaintiff's] actions were jeopardizing the operation of the labs
and, therefore, the academic operations of the College."  (*Id.*)
Specifically, Dr. Price contends that several students voluntarily
approached her and reported that "Ms. Rivers was often away from
her office," that "they were very frustrated with the situation."
(*Id.*)

        After Dr. Price reviewed Dr. Gwebu's memorandum, she advised
that any action taken against plaintiff should have the support of

20

the entire faculty. (Dr. Gwebu's affidavit ¶ 10.) Accordingly, Dr. Gwebu convened a meeting of the chemistry department's faculty on September 29, 1993. *(Id.)*

Each faculty member was given an opportunity to express his or her opinion of plaintiff, and two alternative motions were made: first, to place plaintiff on probation according to Dr. Gwebu's letter; and second, to recommend termination. (Defendant's exhibit 1, no. 33.)

The faculty unanimously voted to recommend that plaintiff's employment be terminated effective November 15, 1993. *(Id.)* Plaintiff was notified of this recommendation by letter from Dr. Gwebu. (Defendant's exhibit 1, no. 32.)

Dr. Price subsequently notified plaintiff, by memorandum dated October 5, 1993, of her decision to accept the faculty's recommendation. (Defendant's exhibit 1, no. 35.) She stated that she "reviewed the documentation submitted to me by the Chemistry Department Faculty concerning your job performance" and was "accepting their recommendation for your termination." *(Id.)*

Following receipt of Dr. Price's letter, plaintiff met with Dr. Price in an effort to retain her job. (Dr. Price's affidavit ¶ 5; plaintiff's deposition at 144.) At no time during this meeting, or

21

at any other time during her employment with the college, did plaintiff complain that she was being discriminated against on the basis of her sex, national origin, or religious preference. (Plaintiff's deposition at 141.)    Dr. Price recommended that plaintiff apologize to Dr. Gwebu and "assure him that, if given her job back, she would improve on all areas of his complaints." (Dr. Price's affidavit ¶ 5.)   Plaintiff does not remember whether Dr. Price suggested that she apologize. (Plaintiff's deposition at 173.)

Subsequent to her conversation with Dr. Price, plaintiff wrote a letter to Dr. Benjamin Reaves, the president of the college, informing him of her "desire to invoke the grievance procedure provided for ... [in] the Oakwood College Staff Handbook." (Defendant's exhibit 1, no. 7.)    Accordingly, the grievance committee was convened on November 24, 1993. (Defendant's exhibit 1, no. 41.)

The committee members reviewed the memorandum exchanged between plaintiff and Dr. Gwebu, and talked with plaintiff and other chemistry department faculty. (Plaintiff's deposition at 154-164.) Plaintiff told them that her termination was not fair, although she admits that she "didn't come out and say that I was being discriminated on religion, sex and gender," and she pleaded with

22

them to let her stay until she obtained her master's degree.  (*Id.*
at 159, 161.)

Ultimately, the grievance committee recommended that plaintiff
be allowed to resign, rather than be terminated, and that she
receive one month's salary.  (*Id.* at 161.)  Dr. Reaves adopted the
recommendation of the grievance committee and notified plaintiff
that "correspondence communicating your termination will be purged
from your file and your letter of resignation inserted."
(Defendant's exhibit 1, no. 44.)

Plaintiff first attempted to resign "under protest," but was
informed that if she did so, she could not keep her one month's
severance pay.  (Plaintiff's deposition at 161-162.)  Therefore,
plaintiff wrote another letter of resignation that did not contain
the words "under protest," and the college paid her one month's
salary.  (*Id.*)  The college ultimately hired a male to fill the
position of laboratory coordinator.  (Gwebu's affidavit ¶ 12.)

### III. DISCUSSION

### A. Defendant's Motion to Strike

Defendant moves to strike a portion of plaintiff's evidentiary
submission filed in opposition to the motion for summary judgment.
Specifically, plaintiff submitted the determination letter issued
by the Equal Employment Opportunity Commission ("EEOC"), wherein

23

the EEOC found "reasonable cause" for believing that the college discriminated against plaintiff.   Plaintiff relies on both the EEOC's "reasonable cause" determination and several of its factual findings to sustain her summary judgment burdens.

Defendant argues that the EEOC determination is inadmissible on a number of grounds.   First, defendant contends that the determination contains "hearsay, conclusory allegations that are completely unsupported by any evidence, and statements that are contradicted by the undisputed evidence that has been submitted to this Court in support of [its] motion for summary judgment." (Motion to Strike at 2.)   Additionally, defendant argues that when a "plaintiff has failed to submit independent evidence to the Court sufficient to preclude summary judgment, conclusory allegations of the EEOC cannot defeat summary judgment.   If that were the case, then the EEOC investigator would usurp the function of this [c]ourt in determining whether summary judgment is appropriate." *(Id.)* Defendant cites *Simms v. Oklahoma*, 165 F.3d 1321, 1331 (10th Cir. 1999), *Goldberg v. B. Green and Company*, 836 F.2d 845, 848 (4th Cir. 1988), and *Johnson v. Yellow Freight System, Inc.*, 734 F.2d 1304, 1309 (8th Cir. 1983), to support its argument.

In this Circuit, the decision to admit an EEOC determination is

24

left "in the sound discretion of the district court." *Barfield v. Orange County*, 911 F.2d 644, 650 (11th Cir. 1990). Although the Ninth and Fifth Circuits virtually have adopted a per se rule of admissibility, *see Paolitto v. John Brown E. & C., Inc.*, 151 F.3d 60, 65 (2nd Cir. 1998), the Eleventh Circuit has followed the majority of other circuits in holding that the district court has discretion to exclude an EEOC determination, because "there may be circumstances in which [the] probative value ... nonetheless is outweighed by the danger of creating unfair prejudice in the minds of a jury." *Barfield*, 911 F.2d at 650; *see also Simms*, 165 F.3d at 1331 (holding that "when the independent facts before the district court judge fail to establish a genuine issue of material fact, a favorable EEOC letter of determination does not create one"); *Paolitto*, 151 F.3d at 64 (holding that even where an EEOC report is admissible under Fed. R. Evid. 803(8)(C), the district court still has discretion to hold "that the report should be excluded under Fed. R. Evid. 403[,] because the likelihood that it would confuse the jury and protract the proceedings outweighed its probative value"); *Goldberg*, 836 F.2d at 848 (holding that because the EEOC's "report merely repeats facts which [plaintiff] himself alleges elsewhere in the case and then states in conclusory fashion

25

that those facts reflect age discrimination," those "findings are not sufficiently probative to create a genuine issue of material fact about [defendant's] intent to discriminate"); *Johnson*, 734 F.2d at 1309 (concluding that although "EEOC reports may contain information that would be useful to the jury, their probative value may be outweighed by problems that would result from their admission").

In deciding the report's admissibility, the district court "may be guided" by a number of variables, including "whether the report contains legal conclusions in addition to its factual content, whether the report raises questions of trustworthiness under Rule 803(8)(C), and whether it presents problems cognizable under Rule 403." *Barfield*, 911 F.2d at 649 (internal citations omitted). Because most of defendant's arguments are relevant to the second variable, whether the report is trustworthy, the court will focus its analysis on that issue.

"[U]nless the sources of information or other circumstances indicate lack of trustworthiness," Fed. R. Evid. 803(8)(C), "factual findings resulting from a [Government] investigation made pursuant to authority granted by law" fall within the "public records" exception to the hearsay rule. *Id.* Generally, however,

26

the fact that evidence is within an exception to the hearsay rule
does not make it admissible per se.  *Hines v. Brandon Steel Decks,
Inc.*, 886 F.2d 299, 302 (11th Cir. 1989).   The evidence "may
nonetheless be excluded in whole or in part if the trial court
finds that [it is] either irrelevant or more prejudicial than
probative."  *Id.*  Moreover, "[t]he advisory comments ... set forth
several considerations to aid in determining the trustworthiness of
a public report:  the timeliness of the investigation; the skill
and experience of the investigator; whether the investigator held
any sort of hearing; and the investigator's impartiality."  *Id.* at
303 (citing Advisory Committee's Notes on Fed. R. Evid. 803(8)(c).)
These considerations are not exhaustive and, indeed, do not apply
to the present argument.  *Id.*

Here, defendant contends that the EEOC determination is due to
be stricken because it is factually inaccurate.  Specifically,
defendant points to a number of factual findings contained within
the EEOC determination that directly contradict undisputed evidence
before this court.

For instance, the EEOC determination makes the following finding
with regard to plaintiff changing the locks on her office door:

Respondent contends that Charging Party made changes of
locks and keys to the Chemistry stockroom and her office

27

without prior authorization[.] Charging Party admits that
she changed the locks and keys, but only after discussing
the matter with her immediate supervisor.  Her immediate
supervisor instructed her to handle the situation and she
did what she felt was best from her point of view as
Director of [the] Stockroom.

(Plaintiff's brief (doc. no. 26), exhibit B at 1-2.)  In sharp

contrast, plaintiff  testified in her deposition that she changed

the lock on her office door without the knowledge or permission of

Dr. Gwebu.

> Q.    Dr Gwebu ... is making the statement ... that the key
>       to your office was changed without his knowledge or
>       approval; is that true?
> A.    Yes.
> Q.    You did not get his approval?
> A.    No.

(Plaintiff's deposition at 230.)  Further, when questioned about

the locks by her own attorney, plaintiff admitted that Dr. Gwebu

had denied permission:

> Q.    Did you indicate to [Dr. Gwebu] at that time that you
>       were going to have the locks changed.
> A.    Yes, I did.
> Q.    Did he say, no, you cannot do that?
> A.    Yes, he did.
> Q.    So he specifically instructed you not to change the
>       lock on your office door?
> A.    Yes.

(*Id.* at 282 (emphasis supplied).)

Moreover, defendant also relies on the EEOC's inaccurate factual

finding that "there was only one person (a Seventh-Day Adventist)

28

who complained about Charging Party's demeanor." Defendant argues that several employees, including Dr. Gwebu, Dr. Lai Hing, Dr. Price, and Flore Hamilton, complained about plaintiff's poor attitude and treatment of faculty.    It is clear from the uncontradicted evidence before this court that more than one individual complained about plaintiff's demeanor.    Defendant submitted affidavits from several chemistry employees in which they criticize plaintiff's treatment of the faculty. For instance, Dr. Price stated the following in the context of her meeting with plaintiff:    "[plaintiff's]    tone    and    demeanor    during    this conversation made it clear to me that Ms. Rivers was acting in an insubordinate [manner] and was incapable or working in a functional manner with Dr. Gwebu."    (Price's affidavit ¶ 5.)    Dr. Lai Hing stated that plaintiff "act[ed] rude to faculty members, including me."    (Lai Hing's affidavit ¶ 2.)    Dr. Gwebu likewise stated that he found plaintiff's "behavior to be unacceptable because, among other things, it showed me that [she] was acting in an insubordinate manner, was not taking the memoranda seriously and was not taking appropriate actions to correct her conduct in accordance with them."    (Dr. Gwebu's affidavit ¶ 7.)

    Additionally, defendant argues that another factual finding contained in the EEOC determination is misleading, and constitutes

29

further grounds for striking the exhibit. Defendant's objection centers around the EEOC finding that "[t]here is no documentation in Charging Party's personnel file to substantiate that Charging Party was ever evaluated as having poor performance or an attitude problem." (Plaintiff's brief (doc. no. 26), exhibit B at 2.) Although it does appear that Dr. Reeves agreed to purge plaintiff's personnel file of "correspondence communicating your termination" (Defendant's exhibit 1, no. 44), the court finds that other documents exist independent of plaintiff's personnel file that demonstrate the existence of problems between plaintiff and Dr. Gwebu. There are a number of memoranda between Dr. Gwebu and plaintiff that identify disputed issues between the parties and, accordingly, plaintiff's personnel file cannot be viewed in isolation. To suggest otherwise is an incomplete and misleading conclusion on the part of the EEOC.

Based on the foregoing, the court agrees with defendant and finds the EEOC determination to be untrustworthy, as some of its key factual findings contradict the evidence submitted to this court. Therefore, the court finds that the EEOC determination letter is due to be stricken from the record.

30

## B. Motion for Summary Judgment

### 1.    Scope of plaintiff's suit

As an initial matter, defendant contends that plaintiff's disparate impact claims, her sexual harassment claim, and her disparate treatment claim (for failure to promote) are beyond the scope of her EEOC charge and, therefore, are due to be dismissed. Plaintiff concedes that "any claims of disparate impact sex discrimination" are beyond the scope of the EEOC charge[4] (plaintiff's brief (Doc. No. 26) at 10), and the court, accordingly, limits its discussion to the sexual harassment claim.

Plaintiff's charge of discrimination was received by the EEOC

---

[4] It is not clear from plaintiff's complaint whether she intended to plead both a sex-based and religious-based disparate impact claim. The pertinent part of plaintiff's complaint states:

That during the course of the Plaintiff's employment with the Defendant's [sic] she was subjected to disparate treatment based upon her sex and upon her religious preference, and that the terms of her employment were affected by the disparate impact of the Defendant's policies.

(Plaintiff's complaint ¶ 7.)

The court, out of an abundance of caution, liberally construes plaintiff's complaint to include both disparate impact claims. The court also notes that defendant has similarly construed plaintiff's complaint and has moved for summary judgment as to both claims.

Plaintiff, however, concedes only that her "claims of disparate impact sex discrimination" are outside the scope of her EEOC charge. She makes absolutely no mention of her religious disparate impact claim in her concession, nor does she otherwise defend this claim from summary judgment. Her failure to otherwise defend this claim, or to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file," [and] designate 'specific facts showing that there is a genuine issue for trial'" *Celotex*, 477 U.S. at 323, 106 S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(e)), is fatal to this claim, as she has not met her summary judgment burden. Accordingly, this claim also is due to be dismissed.

31

on January 27, 1994, and states, in pertinent part:

2.    I was discriminated against on the basis of sex, national origin, and religion by the above-stated employer, which I worked for since on or about January 13, 1992. The above-stated employer is a private college affiliated with the Adventist Church. I was employed by Oakwood College as a Chemistry Lab Coordinator until my termination on or about 9-29-93.

. . .

4.    I have been discriminated against on the basis of religion in the following way: upon discovering that my religious preference was Baptist, my immediate supervisor (Dr. E. T. Gwebu) and other college officials began to harass me and tried to provoke my resignation. Dr. Gwebu harassed me by sending me memos and notes indicating that my work performance was poor, when in fact it was not poor. I believe that my religious preference was a prime consideration in the decision to terminate my employment.

Dr. Gwebu further discriminated against me based on my national origin: I am an American citizen and he is a foreigner, as are many of the professors at the college. He took every possible opportunity to denigrate me because I was an American and made many disparaging remarks about Americans in general. I believe that my national origin was another consideration in the decision to terminate my [employment].

Finally, I was discriminated against on the basis of my sex: after being forced to resign my position, I was replaced by a male employee with less qualifications that I had but who was related to another faculty member at the college. I believe that my sex[,] female[,] was another consideration in the decision to terminate my [employment].

(Plaintiff's brief, Exhibit A.)   Defendant argues that the only gender-based claim contained in plaintiff's EEOC charge is her

32

allegation that she was terminated on the basis of her gender. It makes no mention of any allegations of sexual harassment, although plaintiff clearly contemplated the possibility of harassment claims because she alleged that she was harassed on the basis of her religious preference. Defendant further argues that plaintiff's charge does not mention her complaint that she was not promoted, but instead, focuses solely on defendant's decision to terminate her employment.

It is well established that "the scope of the EEOC complaint should not be strictly interpreted." *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 465 (5th Cir. 1971).[5] Indeed, the former Fifth Circuit instructs that

> procedural technicalities are not to stand in the way of Title VII complainants. Nothing in the Act commands or even condones the application of archaic pleading concepts. On the contrary, the Act was designed to protect the many who are unlettered and unschooled in the nuances of literary draftsmanship. It would falsify the Act's hopes and ambitions to require verbal precision and finesse from those to be protected, for we know that these endowments are often not theirs to employ.

*Id.* Moreover, the *Sanchez* court emphasized that "the specific words of the charge of discrimination need not presage with literary exactitude the judicial pleadings which may follow." *Id.*

---

[5]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981)(en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

33

Thus, the court adopted the following standard for determining

whether a judicial complaint exceeds the bounds of the underlying

EEOC charge:

> [A] judicial complaint ... "may encompass any kind of
> discrimination like or related to allegations contained in
> the charge and growing out of such allegation during the
> pendency of the case before the Commission."    In other
> words, the "scope" of the judicial complaint is limited to
> the "scope" of the EEOC investigation which can reasonably
> be expected to grow out of the charge of discrimination.

*Id*. at 466 (citation omitted).

In *Hornsby v. Conoco, Inc.*, 777 F.2d 243 (5th Cir. 1985), the

Fifth Circuit was faced with an analogous situation and concluded

that the plaintiff's claim of sexual harassment was time-barred

because it was not reasonably related to her claims of sex and age

discrimination.    The plaintiff in *Hornsby* filed her  original

judicial complaint in March of 1981, including allegations of age

and sex discrimination.   In January of 1982, plaintiff attempted to

amend her judicial complaint to include her allegations of sexual

harassment.   The amended complaint, however, was filed outside of

the 180 day limitation provided for in 42 U.S.C. § 2000e-5(e).   The

inquiry, therefore, was whether the amendment related back, under

the *Sanchez* standard, to the allegations in the original complaint.

The Fifth Circuit concluded that they did not, reasoning:

34

The facts included in the [original] complaint make no reference to sexual harassment. When [plaintiff] amended her complaint in January, she added both a new and independent charge, sexual harassment, and new and independent facts to support this claim.

. . .

Our holding in the instant case is consistent with *Sanchez*. . . . Hornsby, unlike Sanchez, added a charge, and facts as well, that are independent of the allegations in her first complaint. Thus, the amended complaint does not properly relate back to the original.

*Hornsby*, 777 F.2d at 247.

Similarly, in *Cheek v. Western and Southern Life Insurance Company*, 31 F.3d 497 (7th Cir. 1994), the Seventh Circuit concluded that "[o]rdinarily, a claim of sexual harassment cannot be reasonably inferred from allegations in an EEOC charge of sexual discrimination." *Id.* at 503. The plaintiff in *Cheek* alleged in her EEOC charge that her manager "intimidated" her and treated her in a "hostile, inferior, [and] unprofessional manner." *Id.* The Seventh Circuit held, however, that "nothing in the charge or affidavit suggests that [plaintiff] was complaining of a sexually hostile environment." *Id.* The Seventh Circuit explained:

Because an employer may discriminate on the basis of sex in numerous ways, a claim of sex discrimination in an EEOC charge and a claim of sex discrimination in a complaint are not alike or reasonably related just because they both assert forms of sex discrimination. The claims are not alike or reasonably related unless there is a factual relationship between them. This means that the EEOC charge and the complaint must, at minimum, describe the same

35

conduct and implicate the same individuals.

*Id.* at 501.  Because plaintiff failed to "refer to conduct in her
EEOC charge that might invoke a legal theory other than the one she
checked on her EEOC charge form," the court held that her sexual
harassment claim was barred, as plaintiff had failed to exhaust her
administrative remedies with regard to that claim.  *Id.* at 503; *see
also Aramburu v. The Boeing Company*, 112 F.3d 1398, 1409-1410 (10th
Cir. 1997) (holding that plaintiff's hostile environment claim was
barred because it "was not reasonably related to his wrongful
discharge claim").

This court likewise concludes that plaintiff's sexual harassment
claim is beyond the scope of her EEOC charge, as it fails to arise
from any like or related factual allegations.  The factual
allegations in plaintiff's charge make no mention of any of the
gender-based statements made by Dr. Gwebu that are contained in
plaintiff's complaint.  Moreover, the allegations merely allege
that she was discriminated on the basis of her sex because she was
"forced to resign [her] position."   The variance between
plaintiff's EEOC filing and her judicial complaint is detrimental
to her sexual harassment claim and, accordingly, the court finds
that it is due to be dismissed.

36

Additionally, the court concludes that plaintiff's promotion claims are due to be dismissed for similar reasons. Specifically, the factual allegations contained in plaintiff's EEOC charge make absolutely no reference to any alternative positions that plaintiff applied for, nor do they mention what promotion positions were available to plaintiff with her qualifications.[6] Because the

---

[6] Moreover, there is no evidence in the record that plaintiff ever sought a promotion, either within the chemistry department or otherwise, during her employment with defendant. Additionally, there is no evidence that a promotion within the chemistry department was even possible for plaintiff. Specifically, in her deposition, plaintiff testified that she was the only lab coordinator in the college's chemistry department:

    Q.    At the time that you were employed, was there one lab
          coordinator?
    A.    Yes, it was just me.
    Q.    And that was you?
    A.    Yes.
    . . .
    Q.    So then is it fair to say that you and Ms. Hamilton were the
          only full-time non-faculty employees in the chemistry
          department at that time?
    A.    Yes.
    Q.    So was there anybody within the chemistry department that had
          a comparable job to you?
    A.    No.
    Q.    You were the only one of your kind?
    A.    Yes.
    Q.    And by that I mean you were the only person who had job duties
          of a lab coordinator?
    A.    Yes.

(Plaintiff's deposition at 170-171.) Accordingly, even if plaintiff's promotion claims are within the scope of her EEOC charge, plaintiff has failed to establish a *prima facie* promotion discrimination claim. Such burden requires plaintiff to prove, at a minimum, that 1) that she is a member of a group protected by Title VII; 2) she sought and was qualified for a position that defendant was attempting to fill; 3) despite her qualifications, she was rejected; and 4) following plaintiff's rejection, defendant filled the position with a person outside her protected class. *See Crawford v. Western Electric Company, Inc.*, 614 F.2d 1300, 1315 (5th Cir. 1980); *Walker v. Mortham*, 158 F.3d 1177, 1192 (11th Cir. 1998). Plaintiff has failed to prove elements two through four, as she has failed to identify a position that she applied for, her qualifications for that position,

37

factual allegations of plaintiff's EEOC charge focus solely on her termination, her promotion claims fall outside the scope of that charge.

## 2.   Plaintiff's discriminatory termination claims

Plaintiff plead two distinct discriminatory termination claims: namely, that she was forced to resign on the basis of her religious preference and her gender.   To prevail on a Title VII disparate treatment claim, plaintiff must prove her employer intended to discriminate on the basis of one of the impermissible factors identified by Congress: *i.e.,* "because of such individual's race, color, religion, sex, or national origin."   42 U.S.C. § 2000e-2(a)(1).   Three forms of proof may be used: (1) statistical proof of a pattern of discrimination;[7] (2) direct evidence of a discriminatory animus;[8] or (3) circumstantial evidence.   The evaluation of a plaintiff's evidence of the employer's intent differs, depending upon which form of proof is used.

### a.   Direct evidence

Direct evidence is evidence which, if believed, proves the existence of a fact in issue without the need of an inference or a

and who was selected for the position.

[7] *See, e.g.,* Wilson v. AAA Plumbing Pottery Corp., 34 F.3d 1024, 1027 (11th Cir. 1994).

[8] *See, e.g.,* Carter v. City of Miami, 870 F.2d 578, 581-82 (11th Cir. 1989).

38

presumption. *See, e.g., Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998) ("Direct evidence, by definition, is evidence that does not require ... an inferential leap between fact and conclusion."); *Merritt v. Dillard Paper Co.*, 120 F.2d 1181, 1189 (11th Cir. 1997) (defining direct evidence as "evidence, which if believed, proves existence of fact in issue without inference or presumption"); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir. 1987) (same); *Black's Law Dictionary* 577 (7th ed. 1999) (defining direct evidence as "[e]vidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption."). The Eleventh Circuit provided some examples to mark the cleavage between direct and circumstantial evidence in *Rollins*:

> One example of direct evidence would be a scrap of paper saying, "Fire Rollins — she is too old." *See Williams [v. General Motors Corp.]*, 656 F.2d [120,] at 130 [(5th Cir. Unit B 1981)]. This court found that there was direct evidence of discrimination when an INS reviewing committee set aside a female applicant's file without reviewing it because the two men knew the director would not consider hiring a woman investigator. *Lewis v. Smith*, 731 F.2d 1535 (11th Cir. 1984). In these instances, the fact that the evidence exists, by itself, proves the discrimination. The evidence at issue here, on the other hand, suggests discrimination. The trier of fact must infer discrimination based on the evidence. By definition, then, it is circumstantial evidence.

*Rollins*, 833 F.2d at 1528 n.6.

39

Direct evidence has the greatest probative value.   When a
plaintiff establishes by direct evidence that a contested
employment decision was motivated by a discriminatory animus, the
employer "may avoid a finding of liability only by proving by a
preponderance of the evidence that it would have made the same
decision even if it had not taken the plaintiff's gender [race,
religion, color, national origin, age, or disability] into
account."  *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258, 109
S.Ct. 1775, 1795, 104 L.Ed.2d 268 (1989) (emphasis supplied); *see
also, e.g., Carter*, 132 F.3d at 641; *Haynes v. W.C. Caye and Co.,
Inc.*, 52 F.3d 928, 931 n.8 (11th Cir. 1995).   In other words,
"defendant must prove that there was a separate, racially neutral
[*i.e.*, non-discriminatory] reason for its [contested employment
decision]."  *E.E.O.C. v. Alton Packaging Corp.*, 901 F.2d 920, 925
(11th Cir. 1990) (emphasis supplied).

> In a direct evidence case, the plaintiff must produce direct
> testimony that the employer acted with discriminatory
> motive, and must convince the trier of fact to accept the
> testimony.  If the plaintiff produces such evidence and the
> trier of fact believes it, the defendant must prove by a
> preponderance of the evidence that the defendant would have
> reached the same decision without the factor proved.   In
> other words, the employer must prove that even if it had not
> taken race into account, it would have come to the same
> decision.

*Id.*, 901 F.2d at 923 (emphasis supplied) (citations omitted).

40

Thus, the characterization of evidence as direct "dramatically affects the allocation of the evidentiary burdens." *Carter*, 132 F.3d at 641. "When there is direct evidence that discrimination was a motivating factor in the challenged employment decision, the appropriate analysis is different from that employed in a case where only circumstantial evidence is available." *Trotter v. Board of Trustees of the University of Alabama*, 91 F.3d 1449, 1453 (11th Cir. 1996) (citing *Bell v. Birmingham Linen Service*, 715 F.2d 1552, 1556 (11th Cir. 1983), *cert. denied*, 467 U.S. 1204, 104 S.Ct. 2385, 81 L.Ed.2d 344 (1984); *Haynes*, 52 F.3d at 931). "By producing direct evidence, the plaintiff effectively shifts the burden of proof to the defendant, who must then show that there was no discrimination. It is rare that direct evidence of discrimination exists, however." *Rollins*, 833 F.2d at 1528.

Statements of decisionmakers directly related to the contested employment action constitute direct evidence of discrimination. *See, e.g., Carter*, 132 F.3d at 641 ("[D]irect evidence relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee.") (quoting *Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1555 (11th Cir. 1990) (internal quotation

41

marks omitted)); *Trotter*, 91 F.3d at 1453 ("Statements indicating
... bias on the part of a decisionmaker in an employment setting
can constitute direct evidence of ... discrimination in Title VII
cases.") (citations omitted); *Bell*, 715 F.2d 1552 (plaintiff's
supervisor voiced bias to plaintiff at the very moment he rejected
plaintiff for promotion); *Thompkins v. Morris Brown College*, 752
F.2d 558, 561, 563-64 (11th Cir. 1985) (statement by decisionmaker
that he saw no need for a woman to have a second job constituted
direct evidence of discriminatory intent).

On the other hand, statements that do "not relate directly to
the decision" in dispute, or "statements that are open to more than
one interpretation do not constitute direct evidence of ...
discrimination." *Carter*, 132 F.3d at 642; *see also Harris v.
Shelby County Board of Education*, 99 F.3d 1078, 1083 n.2 (11th Cir.
1996)(statements that could "have more than one possible meaning"
are not direct evidence of discrimination). "Only the most blatant
remarks, whose intent could only be to discriminate on the basis of
[an impermissible factor] constitute direct evidence." *Coats v.
Coats & Clark, Inc.*, 990 F.2d 1217, 1226 (11th Cir. 1992).
Evidence merely suggesting discrimination is not sufficient. *See*
*Earley v. Champion International Corp.*, 907 F.2d 1077, 1081-82

42

(11th Cir. 1990).

Moreover, "stray remarks in the workplace," "statements by nondecisionmakers," and "statements by decisionmakers unrelated to the decisional process itself" do not "justify requiring the employer to prove that its hiring or promotion decisions were based on legitimate criteria." *Price Waterhouse*, 490 U.S. at 277, 109 S.Ct. at 1804-05 (O'Connor, J., concurring).

For example, in *E.E.O.C. v. Alton Packaging Corp.*, 901 F.2d 920 (11th Cir. 1990), the employer's general manager (Robert Raymond) allegedly said "if [Alton Packaging] was his company, he wouldn't hire any black people." *Id.*, 901 F.2d at 922. In addition, the production manager (Robert Diesen) allegedly yelled at one black employee "--- ---- it, you people can't do a ------- thing right." *Id.* The Eleventh Circuit held the former statement to be direct evidence of discriminatory intent by a decisionmaker, but the latter nothing more than a "stray remark," "unrelated to the decisional process itself."

> *Price Waterhouse* does not define direct evidence. In her concurrence, however, Justice O'Connor stated that "stray remarks in the workplace," "statements by nondecisionmakers," and "statements by decisionmakers unrelated to the decisional process itself" do not "justify requiring the employer to prove that its hiring or promotion decisions were based on legitimate criteria." *Price Waterhouse*, 109 S.Ct. at 1804. Raymond's statement that if

43

it were his company he would not hire blacks does not fall
into any of these categories. Raymond was a decisionmaker,
and he made the remark in reference to hiring. [On the other
hand,] Diesen's statement is the kind of stray remark
contemplated by Justice O'Connor, but does not affect the
outcome. Raymond's statement constituted direct evidence of
discrimination which Alton was required to rebut by a
preponderance of the evidence.   The district court erred
when it failed to place this burden on Alton.

Id. (emphasis supplied).

Another   instructive   case   is   *Hunter   v.   Allis-Chalmers
Corporation*, 797 F.2d 1417 (7th Cir. 1986), in which Judge Posner
of the Seventh Circuit commented upon the relevance and probative
value of stray remarks by nonsupervisory employees.

[A] company certainly is not liable for every racial slur by
a nonsupervisory member of its work force. ... Not only is
it hard to see how an isolated racial slur could be thought
a   significant   enough   event   to   count   as   employment
discrimination;   it   is   unclear   what   practical   steps   an
employer could take to purge all racially offensive speech
from the workplace.

*Hunter v. Allis-Chalmers*, 797 F.2d at 1421 (Posner, J.) (citations
omitted).

Here, plaintiff testified to three separate sets of derogatory
statements made by Dr. Gwebu.  First, Dr. Gwebu allegedly stated
that "Sharron might not like vegetarian meat because she's
Baptist."   (Plaintiff's deposition at 114-115.)   On another
occasion, Dr. Gwebu referred to "the way females are treated and

44

respected in Africa [and how that] is a big difference to what or the way things are done in America." (*Id.* at 102.) Finally, Dr. Gwebu "made some small comment about [how] females sometimes ... are incompetent." (*Id.* at 103.)

None of these comments constitute direct evidence of the college's motive. At most, these comments are mere "stray remarks" and are unrelated to the college's decision to terminate plaintiff's employment. The comments were made months before Dr. Gwebu notified plaintiff, by letter, of his decision to place her on probation. Moreover, even if Dr. Gwebu made the decision to place plaintiff on probation, it is undisputed that other individuals, namely, Dr. Price and Dr. Reaves, made the ultimate decision to terminate plaintiff's employment. Accordingly, plaintiff must prove that the college intended to discriminate against her through circumstantial evidence.

### b.   Circumstantial evidence

Normally, a plaintiff does not possess direct evidence of the employer's motive. "There will seldom be 'eyewitness' testimony as to the employer's mental processes." *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983).

45

> Frequently, acts of discrimination may be hidden or subtle;
> an employer who intentionally discriminate is unlikely to
> leave a written record of his illegal motive, and may not
> tell anyone about it.  ...  Because of those realities,
> plaintiffs are often obliged to build their cases entirely
> around circumstantial evidence.  The unique proof problems
> that accompany discrimination cases are the genesis of the
> unique solutions that the Supreme Court has devised for
> those cases in *McDonnell Douglas* and its progeny.  *See,*
> *e.g., Price Waterhouse v. Hopkins,* 490 U.S. 228, 271, 109
> S.Ct. 1775, 1801-02, 104 L.Ed.2d 268 (1989) (O'Connor, J.,
> concurring) ("[T]he entire purpose of the *McDonnell Douglas*
> prima facie case is to compensate for the fact that direct
> evidence of intentional discrimination is hard to come
> by.").

*Combs v. Plantation Patterns,* 106 F.3d 1519, 1537 (11th Cir. 1997),

*cert. denied sub nom. Combs v. Meadowcraft Co.,* 522 U.S. 1045, 118

S.Ct. 685, 139 L.Ed.2d 632 (1998); *see also, e.g., Sheridan v. E.I.*

*DuPont De Nemours & Co.,* 100 F.3d 1061, 1071 (3d Cir. 1996) (*en*

*banc*) ("The distinct method of proof in employment discrimination

cases, relying on presumptions and shifting burdens of articulation

and production, arose out of the Supreme Court's recognition that

direct evidence of an employer's motivation will often be

unavailable or difficult to acquire.").

When evaluating the evidence in the record, courts are guided

by the now familiar analytical framework that the Supreme Court

announced in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93

S.Ct. 1817, 36 L.Ed.2d 668 (1973), and elaborated in its progeny.

46

*St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Under that framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. If a plaintiff does so, then at the second stage of analysis the burden of production shifts to the defendant to rebut the presumption[9] of intentional discrimination thus created by articulating legitimate, nondiscriminatory reasons for the contested employment action. *See Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093. If a defendant carries its burden, then in the final step of inquiry the plaintiff must have an opportunity to "come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Combs*, 106 F.3d at 1528 (citing *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095; *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825).

---

[9]See Walker v. Mortham, 158 F.3d 1177, 1185 n.10 (11th Cir. 1998), for an excellent discussion of the reasons why presentation of a prima facie case creates "a *presumption*, and not an *inference*, of intentional discrimination." (Emphasis in original.)

47

## (1) Plaintiff's *prima facie* case

To establish a *prima facie* case of discriminatory termination under Title VII, a plaintiff employee must show "(1) membership in a protected class, (2) qualification for the position held, (3) termination, (4) and replacement with a person outside the protected class." *Walker v. NationsBank of Florida*, 53 F.3d 1548, 1556 (11th Cir. 1995) (citing *Rollins v. TechSOUTH, Inc.*, 833 F.2d 1525, 1532 n.14 (11th Cir. 1987)). Furthermore, the Eleventh Circuit has "repeatedly stressed that an overly strict formulation of the elements of a prima facie case is to be avoided." *Id.* (citing *Carter v. City of Miami*, 870 F.2d 578, 583 (11th Cir. 1989)). Essentially, determining whether a plaintiff has established a prima facie case is a fact specific inquiry that asks, "[w]ould an ordinary person reasonably infer discrimination if the facts presented remained unrebutted?" *Id.* at 1556 n.12 (citing *Carter*, 870 F.2d at 583).

With regard to plaintiff's sex discrimination claim, the court finds that she has established a prima facie case of disparate treatment. Plaintiff is a member of a protected class (female) and she was terminated from her position at the College. Additionally, plaintiff has proven that she was qualified for the position of

48

laboratory coordinator and, indeed, Dr. Gwebu recommended that plaintiff be made a full-time salaried employee because "[i]ntially, Ms. Rivers performed well in her job." (Gwebu's affidavit ¶ 4.) Moreover, Dr. Gwebu admitted that the college hired "Daniel Jack, an American-born U.S. citizen" to replace plaintiff, thus satisfying the last requirement. (*Id.* ¶ 12.)

With regard to plaintiff's religious discrimination claim,[10] however, plaintiff has failed to offer any evidence of Mr. Daniel's religious preference. In plaintiff's brief (doc. no. 26) and in her complaint (doc. no. 1), she concludes that Daniel Jack was a Seventh-Day Adventist, but significantly fails to offer any evidence to support that conclusion.[11] Not even in plaintiff's deposition does she offer testimony regarding Daniel Jack's

---

[10] Adapting the *prima facie* elements of a race or gender discrimination claim to the present allegations of religious discrimination, plaintiff must prove the following to establish a *prima facie* case of discriminatory discharge:

(1) that [she] is a member of and/or practices a particular religion, (2) that [she] was qualified for the job from which [she] was discharged, (3) that [she] was discharged, and (4) that [her] former position was filled by a person of a different religion or a person of no religion at all. ... Alternatively, [plaintiff] may satisfy the fourth requirement by showing that [she] was terminated while others having comparable or lesser qualifications and not of [her] religion were retained, or that [she] suffered from differential application of work or disciplinary rules.

*Breech v. Alabama Power Company*, 962 F. Supp. 1447, 1457 (S.D. Ala. 1997).

[11] To the extent that plaintiff relies on the EEOC determination to support her claim, such reliance is insufficient as the court has stricken that document from the record due to its lack of trustworthiness. *See* discussion *supra* at IV(A).

49

Adventist beliefs.   Because plaintiff is required to offer more than conclusory allegations to establish a prima facie case, *see Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376-77 (11th Cir. 1996), plaintiff's religious discrimination claim is due to be dismissed.

In any event, plaintiff has established a *prima facie* case of sex discrimination, and the burden of production shifts to the college to rebut the presumption of intentional discrimination. *See Burdine*, 450 U.S. at 253, 101 S. Ct. at 1093.   Under this production burden, the college must articulate legitimate, nondiscriminatory reasons for the contested employment action.   *Id.*

> (2)   **Defendant's legitimate, nondiscriminatory reasons**

Defendant argues that plaintiff's termination was not based upon her sex, but solely upon her poor job performance.   (Defendant's brief (doc. no. 23) at 34.)   Defendant has specifically identified five separate non-discriminatory reasons for plaintiff's termination:

a.   Rivers had persistent problems with inaccessibility of the lab lockers, which were located in Rivers' office area where lab supplies were kept, which prevented students from participating in their labs[;]

b.   Rivers repeatedly was absent from her office during

50

work hours and did not let the faculty know where she
was, how she could be reached and when she would
return, all of which hindered the operation of the
labs[;]

c.    Rivers ordered the locks changed without
authorization or permission and contrary to Dr.
Gwebu's instructions, which resulted in students and
faculty being locked out of the supply lockers in her
office, which, in turn, hindered the operation of the
scheduled labs[;]

d.    Rivers acted inappropriately and in an insubordinate
manner to members of the faculty, including Dr. Lai
Hing during the Summer of 1993 when Rivers failed to
follow his instructions to order proper lab supplies
and raised her voice and finger at him in a
disrespectful manner[; and]

e.    Rivers abused the limited permission she was given to
attend classes at Alabama A & M so long as the
classes did not interfere with her work as the lab
coordinator. Contrary to her representations, Rivers
missed work as a result of her classes at Alabama A
& M and failed to give adequate notice of her
absences relating to those classes, which clearly
interfered with her work as lab coordinator.

(*Id.* at 34-35.)

Based on the foregoing articulation, the court finds that
defendant has met its intermediate burden of production, and
effectively rebutted the burden of discrimination raised by
plaintiff's *prima facie* case. Thus, the burden shifts to plaintiff
to demonstrate pretext.

### (3) Plaintiff's showing of pretext

"The defendant's 'production' (whatever its persuasive effect)

51

having been made," *Hicks*, 509 U.S. at 511, 113 S.Ct. at 2749, "the

factual inquiry proceeds to a new level of specificity." *Burdine*,

450 U.S. at 255, 101 S.Ct. at 1095.

> [T]he "new level of specificity" ... refer[s] to the fact
> that the inquiry now turns from the few generalized factors
> that establish a prima facie case to the specific proofs and
> rebuttals of discriminatory motivation the parties have
> introduced.

*Hicks*, 509 U.S. at 516, 113 S.Ct. at 2752.

At this third level of analysis, the plaintiff must be afforded

the opportunity to discredit the defendant's proffered explanations

for the contested employment decision, and to show that it is but

a pretext for discrimination. "In other words, the plaintiff has

the opportunity to come forward with evidence, including the

previously produced evidence establishing the prima facie case,

sufficient to permit a reasonable factfinder to conclude that the

reasons given by the employer were not the real reasons for the

adverse employment action." *Combs*, 106 F.3d at 1528; *see also*

*Hicks*, 509 U.S. at 507-08, 113 S.Ct. at 2747-48 ("The plaintiff

then has the full and fair opportunity to demonstrate, ... that the

proffered reason was not the true reason for the employment

decision, ... and that race [or age] was. He retains that ultimate

burden of persuading the [trier of fact] that [he] has been the

52

victim of intentional discrimination.") (citations to *Burdine* and internal quotation marks omitted).

If the plaintiff succeeds in casting doubt upon the credibility of the explanations put forward by the defendant — in other words, "if there is sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons for its challenged action" — then "it follows from *Hicks* that a plaintiff is entitled to survive summary judgment, and judgment as a matter of law...." *Combs*, 106 F.3d at 1529; *see also id.* at 1532 ("To summarize, ... this circuit's post-*Hicks* decisions uniformly hold that once a plaintiff has established a prima facie case and has put on sufficient evidence to allow a factfinder to disbelieve an employer's proffered explanation for its actions, that alone is enough to preclude [summary judgment or] entry of judgment as a matter of law.").

In an attempt to rebut defendant's contention that she was terminated for non-discriminatory reasons, plaintiff argues that each of defendant's five articulated reasons are pretextual. (Plaintiff's brief (doc. no. 26) at 12-13.) *See Combs*, 106 F.3d at 1543 (noting that plaintiff must produce sufficient evidence "to discredit in the mind of a reasonable juror all of the defendant's

53

proferred nondiscriminatory reasons for its actions"); *see also*
*Watkins v. Sverdrup Technology, Inc.*, 153 F.3d 1308, 1316-1317
(11th Cir. 1998) (finding that plaintiffs "failed to impeach all of
[defendant's] non-discriminatory reasons").

Of particular concern to the court is plaintiff's argument with
regard to her decision to change the locks on her office door
(defendant's third non-discriminatory reason). Plaintiff defends
that decision as follows:

> The Plaintiff admits that the lock to the door of her
> personal office was in fact changed, but denies that such a
> change had any affect on the management or operation of the
> Chemistry Department. Again, the Plaintiff's testimony
> indicates that (1) no lab supplies were kept within her
> personal office area, the only area which faculty did not
> have open access; (2) each locker had a key maintained
> within the stock room and outside of Plaintiff's office; and
> (3) all of the faculty members and several students had keys
> to the stock room and labs.

(*Id.*)

Upon close examination of plaintiff's actual deposition
testimony, rather than the conclusions offered by plaintiff's
counsel, the court concludes that plaintiff has failed to prove
pretext with regard to the lock incident. It is undisputed that
plaintiff changed the locks on her office door without prior
permission from her supervisor, Dr. Gwebu. (Plaintiff's deposition
at 230, 282.) Indeed, it is undisputed that Dr. Gwebu specifically

54

instructed plaintiff <u>not</u> to change the locks on her office door,

and her act in doing so was deliberately defiant to his

instructions:

> Q.     With respect to the lock incident, was there a
>        particular reason why you had the lock changed on
>        your office door?
> A.     Yes.
> Q.     What was that reason?
> A.     One reason, there was a fire in the office over the
>        weekend and all my personal belongings were burned,
>        and they didn't investigate what happened or anything
>        of that nature. ... He didn't do anything about it,
>        so I went and had the locks changed.
> Q.     <u>Did you indicate to him at that time that you were
>        going to have the locks changed</u>?
> A.     <u>Yes, I did</u>.
> Q.     <u>Did he say, no, you cannot do that</u>?
> A.     <u>Yes, he did</u>.
> Q.     <u>So he specifically instructed you not to change the
>        lock on your office door</u>?
> A.     <u>Yes</u>.

(*Id*. at 281-282 (emphasis supplied).)

Although plaintiff argues that Dr. Gwebu's decision was

unreasonable, namely because there was no need for the faculty to

have access to her office, such argument is immaterial to this

court's analysis. The only relevant consideration is whether

plaintiff changed the locks without Dr. Gwebu's permission.

Because plaintiff admits that Dr. Gwebu specifically told her <u>not</u>

to do that, whatever his justification for that decision might be,

and plaintiff then intentionally disobeyed his specific directive,

55

she has failed to prove pretext with regard to this issue.  A plaintiff cannot establish pretext by merely disagreeing with, or questioning an employer's stated reason for an adverse employment action.  "Stated somewhat differently, a plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, at least not where, as here, the reason is one that might motivate a reasonable employer."  *Combs*, 106 F.3d at 1543.

Moreover, the court has reviewed the entire record and can find no evidence of gender discrimination.  The court has considered the numerous memorandum exchanged between plaintiff and Dr. Gwebu and concludes that, at most, both of these individuals obviously disagreed as to how the job of laboratory coordinator should be performed.  Such disagreement, however, is not actionable under Title VII.  As the Eleventh Circuit has stated:

> Title VII prohibits discrimination; it "is not a shield against harsh treatment at the work place."  Personal animosity is not the equivalent of sex discrimination and is not proscribed by Title VII.  The plaintiff cannot turn a personal feud into a sex discrimination case by accusation.  There was no proof offered to show that [defendant] was prejudiced against the plaintiff ... on account of sex.

*McCollum v. Bolger*, 794 F.2d 602, 610 (11th Cir. 1986) (citation omitted).  Furthermore, as stated by the Seventh Circuit in the

56

context of an age discrimination claim, which is analogous to the

present sex discrimination claim:

> The employee doesn't get to write his own job description.
> An employer can set whatever performance standards he wants,
> provided they are not a mask for discrimination on forbidden
> grounds such as race or age. He can set unrealistic
> standards and fire an employee for not being able to meet
> them; he can (as perhaps happened here) try to force a
> square peg into a round hole — and throw away the peg when
> it doesn't fit. He can be as arbitrary as he wants — he
> just cannot treat an older employee more harshly than a
> younger one.

*Palucki v. Sears, Roebuck & Company*, 879 F.2d 1568, 1571 (7th Cir.

1989).

Although plaintiff's disagreement with Dr. Gwebu resulted in an

unfortunate result for her, and his reasons for that decision

appeared arbitrary to plaintiff, such disagreement cannot form the

basis for relief. Accordingly, defendant's motion for summary

judgment is due to be granted and plaintiff's sex discrimination

claim is due to be dismissed.

**3. Plaintiff's hostile religious environment claim**

Title VII makes it unlawful for an employer:

> to fail or refuse to hire or to discharge any individual,
> or otherwise to discriminate against any individual with
> respect to his compensation, terms, conditions, or
> privileges of employment, because of such individual's
> race, color, religion, sex, or national origin ....

42 U.S.C. § 2000e-2(a)(1). In *Meritor Savings Bank v. Vinson*, 477

57

U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the Supreme Court concluded that "[t]he phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment." *Id.* at 64, 106 S.Ct. at 2404 (quoting *Los Angeles Department of Water and Power vs. Manhart*, 435 U.S. 702, 707, 98 S.Ct. 1370, 1374, 55 L.Ed.2d 657 (1978)). Encompassed within that "spectrum" is the right of individuals to work in an environment that is not discriminatorily hostile or abusive. *See Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). According to the *Harris* court:

> When the workplace is permeated with "discriminatory intimidation, ridicule, and insult," that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," Title VII is violated.

*Id.* (quoting *Meritor Savings Bank*, 477 U.S. at 65, 106 S.Ct. at 2405) (internal citations omitted).

Here, plaintiff claims that she experienced a hostile religious environment. The Eleventh Circuit recently summarized the elements a plaintiff must allege to state a claim for gender discrimination based on a sexually hostile work environment. *See Mendoza v. Borden, Inc.*, 158 F.3d 1171 (11th Cir. 1998). Those elements apply

58

by analogy to plaintiff's claim of religious discrimination and,
accordingly, have been altered to require that plaintiff prove:

> (1) that he or she belongs to a protected group; (2) that
> the employee has been subject to unwelcome [religious]
> harassment...; (3) that the harassment must have been
> based on the [religion] of the employee; (4) that <u>the</u>
> <u>harassment was sufficiently severe or pervasive to alter</u>
> <u>the    conditions    of    employment    and    create    a</u>
> <u>discriminatorily abusive environment</u>; and (5) a basis for
> holding the employer liable.

*Id.* at 1244 (emphasis supplied); *see also Hafford v. Seidner*, 183
F.3d 506, 512 (6th Cir. 1998) (specifically articulating the
requisite elements for a hostile religious environment claim).  The
Supreme Court reiterated in *Harris* that Title VII liability for a
hostile work environment "takes a middle path between making
actionable any conduct that is merely offensive and requiring the
conduct to cause a tangible psychological injury."   *Harris*, 510
U.S. at 21, 114 S.Ct. at 370.

A plaintiff must show not only that she <u>subjectively perceived</u>
her work environment to be hostile, but also that the conduct
creating this environment was sufficiently severe or pervasive to
make her perception <u>objectively reasonable</u>:

> Conduct that is not severe or pervasive enough to create
> an objectively hostile or abusive work environment—an
> environment that a reasonable person would find hostile
> or abusive—is beyond Title VII's purview.  Likewise, if
> the victim does not subjectively perceive the environment

to be abusive, the conduct has not actually altered the
conditions of the victim's employment, and there is no
Title VII violation.

*Id.* at 21-22, 114 S.Ct. at 370. The *Harris* court also pinpointed
a number of factors that aid in determining whether a work
environment is sufficiently hostile to violate Title VII:

These may include the <u>frequency</u> of the discriminatory
conduct; its <u>severity</u>; whether it is <u>physically</u>
<u>threatening or humiliating, or a mere offensive</u>
<u>utterance</u>, and whether it <u>unreasonably interferes with an</u>
<u>employee's work performance</u>.

*Id.* at 23, 114 S.Ct. at 371 (emphasis supplied) (concluding that
whether a work environment is hostile depends on an analysis of
"all the circumstances").

With the foregoing standards in mind, this court has reviewed
plaintiff's deposition testimony and finds that plaintiff only has
identified two comments that are relevant to her hostile religious
environment claim. (Plaintiff's deposition at 114-116.) Both
comments were made during chemistry department faculty meetings in
the Spring of 1993. The first comment was summarized by plaintiff,
as follows:

In one meeting, they was ordering something to eat, and
everybody there ordered vegetarian chicken, I believe. And
when it came time for me to order, I guess it was in a joke
form, [Dr. Gwebu] was like, wait a minute, Sharron might not
like vegetarian meat because she's Baptist, so let's wait
and see what she wants to order, in a joking statement.

60

(*Id.* at 114-115.) The second comment centers around a discussion of operating the lab on Sunday. (*Id.* at 116.) Plaintiff, together with Mr. Patel, another faculty member, voiced their displeasure with such a suggestion, and "they accommodated me and Mr. Patel by not having the labs on Sundays." (*Id.* at 116.)

The court concludes that these two comments fail to establish her claim of a hostile religious environment, because they fail to show that any harassment to which plaintiff was subjected was sufficiently "severe or pervasive ... to alter the terms and conditions of employment." *Mendoza*, 195 F.3d at 1248. Rather, plaintiff's complaint focuses on two, isolated incidents of, at worst, "merely offensive" conduct, which is not actionable under Title VII. *See Harris*, 510 U.S. at 21, 114 S.Ct. at 370. "Title VII does not attempt 'to purge the workplace of vulgarity ....'" *Hopkins v. Baltimore Gas and Electric Company*, 77 F.3d 745, 753 (4th Cir. 1996) (quoting *Baskerville v. Culligan International Company*, 50 F.3d 428, 430)).

In sum, the conduct of which plaintiff complains was not "pervasive" as a matter of law. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998) (noting that "off hand comments" and "isolated incidents (unless

61

extremely serious) will not amount to discriminatory changes in the
terms and conditions of employment"); *Lopez v. S.B. Thomas, Inc.*,
831 F.2d 1184, 1189 (2d Cir. 1987) (to be deemed pervasive, the
conduct must be more than episodic; it must be sufficiently
continuous and concerted), *overruled on other grounds by Patterson
v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2362, 105 L.Ed.2d
132 (1989).

At most, plaintiff was subjected to a few, subjectively
offensive utterances while employed by defendant, but none rose to
the level of "creat[ing] a discriminatorily abusive working
environment." Accordingly, based on the factors delineated by the
Supreme Court in *Harris*, this court finds that plaintiff has failed
to show that a reasonable person would deem the conduct of which
she complains sufficiently severe or pervasive to constitute a
sexually hostile working environment.

## IV.  CONCLUSION

Based on the foregoing, the court finds that defendant's motion
to strike is due to be granted.  The court also concludes that
defendant's motion for summary judgment is due to be granted in its
entirety, and all of plaintiff's claims dismissed.  An order
consistent with this memorandum opinion will be entered

62

contemporaneously herewith.

**DONE** this _10th_ day of January, 2000.

United States District Judge

63